**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SHEILA R. BROWN** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12 C 1750 |
| | ) | |
| v. | ) | Magistrate Judge Daniel G. Martin |
| | ) | |
| **MICHAEL J. ASTRUE** | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Sheila Brown ("Plaintiff" or "Brown") seeks judicial review of a final decision of Defendant Michael J. Astrue, the Commissioner of Social Security ("Commissioner"). The Commissioner denied Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income benefits ("SSI") under Title II of the Social Security Act, and Brown filed a motion for summary judgment. The parties have consented to have this Court conduct any and all proceedings in this case, including an entry of final judgment. 28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c). For the reasons stated below, Plaintiff's motion is granted.

## I. <u>Legal Standard</u>

### A. The Social Security Administration Standard

In order to qualify for DIB, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. *See* 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at Step 2 whether the claimant's physical or mental impairment is severe and meets the twelve-month durational requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At Step 3, the SSA compares the impairment (or combination of impairments) found at Step 2 to a list of impairments identified in the regulations ("the Listings"). The specific criteria that must be met to satisfy a Listing are described in Appendix 1 of the regulations. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a Listing, the individual is considered to be disabled, and the analysis concludes; if a Listing is not met, the analysis proceeds to Step 4. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his exertional and non-exertional capacity to work. The SSA then determines at the fourth step whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id.* If the claimant cannot undertake past work, the SSA proceeds to Step 5 to determine whether a substantial number of jobs exist that the claimant can perform in light of his RFC, age, education, and work experience. An individual is not disabled if he can do work that is available under this standard. 20 C.F.R. §

2

404.1520(a)(4)(v).

### B.  Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court.  Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations.  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions.  *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review."  *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).  Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence.  *Elder*, 529 F.3d at 413 (citation omitted).

## II.  Background Facts

Brown has been treated for a variety of physical and mental conditions, including bi-lateral knee pain, restrictions in the use of her shoulders, cervical spine pain, diabetes,

a skin disorder, alcohol abuse, and depression. The ALJ's decision only concerns Plaintiff's neck pain, shoulder limitations, and depression. The Court limits its consideration to those portions of the record related to these conditions.

## A. Brown's Physical History

Brown began experiencing neck pain as early as 2005, when a MRI was ordered to evaluate her condition. The results of that study are not part of the record, but notes from the Hennepin County Medical Clinic ("HCMC") in April 2008 indicate that the MRI showed cervical stenosis and a bulging of the cervical discs at multiple levels. (R. 332). The notes also state that Brown had previously been treated at HCMC's pain clinic, where she had been prescribed the pain medications Vicodin and morphine to control her discomfort. (R. 331-32, 676).

A second MRI in the spring of 2008 showed a loss of the normal inward curvature in Brown's neck and mild disc narrowing at C2-C3, C3-C4, C4-C5, and C5-C6. (R. 669). Brown followed up on this study with neurosurgeon Dr. Walter Galicich at the HCMC clinic for both neck and shoulder pain. Dr. Galicich did not find any significant shoulder pathology, but he reconfirmed the results of the recent MRI study of Brown's cervical spine. (R. 675-76).

As Dr. Galicich's notes suggest, Brown was experiencing pain in her right shoulder, together with some limitations in her range of motion. On July 14, 2008, she underwent a MRI of the right shoulder to determine the cause of these complaints. The radiology report indicated that she had suffered a tear to the supraspinatus tendon of her right shoulder, together with a narrowing of the subacromial space that impinged on the supraspinatus. (R. 703). Brown sought help for this diagnosis by meeting with orthopedic

4

surgeon Dr. Jonathan Haas on September 23, 2008. Dr. Hass noted that she had been experiencing pain and some weakness in both shoulders for about one year. (R. 302). He determined that Brown suffered from a significant intrasubstance tear over fifty percent of her right supraspinatus tendon and a mild narrowing of the humeral cartilage. (R. 302-03). Dr. Haas treated her with a subacromial injection and referred Brown to physical therapy. (R. 303).

By this point, Brown had received several recommendations from her physicians for physical therapy. She complied with them by meeting with therapist Hegel Brandes on June 23, 2008. At her initial evaluation, Brown complained of shoulder pain at a level of nine out of ten and neck pain at seven out of ten. (R. 670). Brown completed sixteen therapy sessions but felt unable to continue with the final stages of treatment due to worsening symptoms of her depression. (R. 320).

Nevertheless, she met her goals of reaching overhead with reduced pain and was released with a home exercise program. (*Id*.). Brown resumed treatment for her pain by undergoing treatments with chiropractor Dr. Timothy Hammer from March 23, 2009 through July 2010. (R. 538-619). Dr. Hammer did not note any significant improvement in her symptoms. By November 2009, Brown was "in [an] extreme amount of pain" that she rated at nine out of ten. (R. 611). The pain was at eight out of ten at the final visit in July 2010. (R. 617).

Brown returned to her neurosurgeon on December 29, 2009 to see if surgery was a possibility for her continuing pain. Dr. Galicich noted that she was no longer experiencing significant pain radiation through her arms and had a good range of motion in the cervical spine. (R. 736). Absent any signs of a radiculopathy or a myelopathy, Dr. Galicich

concluded that an occipital nerve block was more appropriate than surgery. (*Id*.). Brown had already received a bupivacaine injection at HCMC on September 6, 2010, which she found had relieved her pain temporarily. (R. 711).

Brown was also administered a variety of prescription pain medications throughout her treatment to help control her discomfort. The full scope of her pharmacological treatment is not entirely clear from the record, but Brown appears to have been prescribed Vicodin and morphine at HCMC's pain clinic prior to April 2008. (R. 331-32, 673). A SSA disability report cites a daunting list of medications Brown was taking on or around October 2008 for pain and insomnia, including carisoprodol (Soma), midazolam, morphine sulfate beads, morphine, trazadone, and Vicodin. (R. 210). These were in addition to the other medications prescribed for her skin irritations and depression.

Brown's treatment professionals continued to prescribe a variety of pain medications and muscle relaxants, including Vicodin, morphine, Soma, oral cortisone, and nerve injections. (R. 210,400, 625). The combination of these medications varied, but the last treatment records of July 2010 show that Brown's physicians were still prescribing Vicodin as well as gagapentin for pain. (R. 418, 724).

### B. Brown's Mental Health History

In addition to her physical impairments, Brown began treatment for depression at least as early as June 2008. Nurse practitioner Melissa McClellan noted that Brown felt depressed and had become increasingly forgetful. (R. 297). By September 2008, Brown was taking the antidepressant medications Prozac and trazodone, which helped both with her depression and insomnia. (R. 310). Despite this improvement, nurse McClellan continued to be concerned about Brown's reports of increased memory loss. Brown

claimed, for example, that she would walk into her kitchen for a glass of water only to forget what she was seeking. (R. 310).

### 1. Dr. Mark Schuler

Brown's memory losses led another nurse practitioner, Katherin Lund, to refer her to psychologist Dr. Mark Schuler in October 2008 for an evaluation of her cognitive functions. He described Brown as depressed and noted that a long struggle with alcohol addiction, which was currently under control, may have masked "a background mild depression that is of a longstanding nature." (R. 280). Dr. Schuler's evaluation primarily involved a battery of cognitive tests to assess Brown's overall functioning. The Wechsler Adult Intelligence Scale-III test indicated that Brown's overall IQ was a "borderline" low normal score of 74. (R. 278). Dr. Schuler concluded from this and other tests that Brown's memory problems were likely the result of her relatively low level of intellectual functioning. (R. 279-80). He concluded that she had a major recurring depressive disorder, reading disorder, and borderline intellectual functioning. (R. 281).

### 2. Dr. Alford Karayusuf

Lund also referred Brown to psychiatrist Dr. Alford Karayusuf for a consultative exam in December 2008. Dr. Karayusuf noted that Brown believed her unhappiness stemmed from a series of traumatic losses. These included the death of her infant son in 1991, the murder of another son in 1995, the deaths of her parents, and the simultaneous deaths of her sister and boyfriend by electrocution in 1997. (R. 334). Dr. Karayusuf stated that Brown exhibited very low self esteem and had decreased memory and concentration. Her daily activities were limited to heating food in a microwave, grocery shopping once a month, and doing only occasional housework. After conducting a mental status exam

involving calculations and recall, Dr. Karayusuf concluded that Brown's IQ was in the "dull normal range" with impaired recent recall. He diagnosed Brown with "major depression, recurrent, moderate to severe, with psychotic features" that had existed for seventeen years. (R. 334-35). The psychiatrist assessed Brown's prognosis as "guarded" and stated that she would not be able to maintain pace or persistence in a work setting. (R. 335).

### 3. Katherin Lund

Dr. Karayusuf noted that Brown's ongoing mental health treatment consisted of occasional meetings with nurse practitioner Katherin Lund for medication management. Lund placed Brown on the antidepressant medication citalopram and continued her trazodone to treat ongoing insomnia. (R. 445). In January 2009, Lund prescribed the antidepressant Effexor instead of citalopram, but switched those medications in May 2009 and added the antidepressant Seroquel. (R. 474, 482-83). By July 30, 2009, Brown was taking all three medications, together with trazadone for sleep. (R. 469). She eventually ceased taking Seroquel because, as a diabetic, it raised her blood glucose levels. Brown had reduced her antidepressants to citalopram only by January 2010. (R. 429).

Brown was advised to participate in group and individual therapy sessions as part of her treatment. She did attend at least four meetings that were designed to support depressed patients with diabetes. (R. 438, 441, 446, 454). Her group leader noted that Brown arrived at the first session "overwhelmed" by the need to check her blood sugar and to change her eating habits. (R. 454). Despite her participation in this group, Brown refused on several occasions to participate in therapy directly related to her depression. (R. 419, 427). Lund's final treatment note states that as of July 23, 2010, Brown still showed signs of a depressed mood, was confused and forgetful, and displayed illogical

thinking.  (R. 414).

## C.  The State Agency Physicians' Reports

In addition to the consultative psychological exams provided by Dr. Schuler and Dr. Karayusuf, the record also contains several reports by non-examining state agency physicians that evaluate Brown's mental and physical functioning.

### 1.  Dr. Fred Kladder

On December 30, 2008, Dr. Fred Kladder issued a Psychiatric Review Technique ("PRT") evaluation of Brown's affective disorder.  As required by a PRT, Dr. Kladder assessed the Paragraph B and Paragraph C criteria for mental impairments that are identified in Listing 12.04.  These criteria are described more fully below.  He found that under Paragraph B Brown suffered from mild limitations in her activities of daily living and social functioning, had moderate restrictions in her concentration, but had experienced no episodes of decompensation.  (R. 347).  No Paragraph C criteria were found to exist.  (R. 348).  Dr. Kladder concluded -- contrary to Dr. Karayusuf's conclusions -- that Brown had the mental RFC to perform simple work activities on a routine basis.  He also believed that she had with no problems in relating to others or doing chores at an appropriate pace.  (R. 354).  However, Dr. Kladder assessed a moderate restriction in Brown's ability to complete a normal workday and a moderate limitation in responding appropriately to changes in her work setting.  (R. 352-53).

### 2.  Dr. Steven Richards

On January 14, 2009, Dr. Steven Richards issued a physical RFC for Brown.  Dr. Richards found that Brown could lift twenty pounds occasionally and up to ten pounds frequently.  She could sit and stand for six hours in a workday and had an unlimited ability

to push and pull.  (R. 368).  Dr. Richards found Brown's pain allegations to be "partially credible" and limited her to only occasional kneeling, crouching, or crawling.  (R. 369-70).

### D.  Hearing Testimony

Brown described her physical difficulties as including chronic neck pain, a torn rotator cuff, bilateral knee arthritis, and low back pain.  She claimed that these conditions often kept her from sleeping at night.  (R. 44).  Her sleep is also disrupted by her depression.  Brown testified that could awaken as early as 6:00 a.m., but if she was having a "bad day" with depression, she would not wake up until the afternoon.  (R. 50-51).  Brown stated that she no longer takes morphine for her pain but continues to take Vicodin.  Just prior to the hearing, Brown's ongoing depression required her to raise her citalopram dose from forty to eighty milligrams a day.  (R. 47).

Brown stated that her impairments had a serious impact on her ability to care for her two sons.  Her children iron clothes, make their beds, and help Brown with kitchen work such as opening cans.  (R. 45-46).  Brown herself primarily cooks items that can be microwaved; otherwise her sons take the lead in preparing food.  (R. 45).  She goes grocery shopping with a neighbor, or if she must go alone, she buys only small items.  (R. 52).  Her daily activities are restricted to watching TV and arriving for doctors' appointments.  (R. 51).  Memory and concentration are especially difficult for her.  Brown stated that she forgets where she has put her keys and cannot remember events that happened only yesterday.  (R. 51).

At the end of her testimony, Brown's attorney asked her to explain why she had stopped attending the diabetes/depression group sessions and did not pursue individual treatment for depression.  Brown explained that she had ceased attending group therapy

for depression and diabetes because she did not like "to talk about the same thing over and over again. I don't want to talk about what happened to me." (R. 53). When pressed to respond more fully, Brown explained that she was referring to the deaths of her two sons. The transcript states twice that she then began "crying uncontrollably." The ALJ herself became so concerned over the situation that she asked if 911 should be called to provide emergency services for Brown. The hearing testimony came to an end when Brown's attorney declined the offer.[1] (R. 54-55).

### E. The ALJ's Decision

ALJ McClain-Leazure issued a written decision on November 5, 2010 finding that Brown was not disabled. She found at Step 1 that Brown had not engaged in substantial gainful activity since her alleged onset date of November 15, 2006. (R. 18). At Step 2, the ALJ determined that Brown's severe impairments included disorders of the back, a tear to her right shoulder tendon, and depression. (R. 19). The spinal impairment was not found at Step 3 to meet or medically equal Listing 1.04, which describes disorders of the spine. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. The ALJ also applied the "special technique" required under 20 C.F.R. § 1520(a) for assessing the severity of mental disorders at Step 3.[2] Her Paragraph B analysis showed that Brown suffered moderate restrictions in the three primary areas of activities of daily living, social functioning, and concentration,

---

[1] Testimony was also given by vocational expert ("VE") Robert Brezinski. As Brown does not argue that the ALJ erred at Step 5 and does not dispute any of Brezinki's testimony, the Court omits a summary of the VE's statements.

[2] The special technique is used at Step 2 and Step 3 to identify the functional limitations that stem from a claimant's mental impairment. *Craft*, 539 F.3d at 674. An ALJ first rates the degree of limitations in the four areas under Paragraph B: (1) activities of daily living, (2) social functioning, (3) concentration, persistence, and pace, and (4) episodes of decompensation. These limitations are rated as none, mild, moderate, marked, or extreme. 20 C.F.R. § 404.1520a(c)(4).

persistence, or pace. (R. 19-20). No episodes of decompensation were found, and the ALJ concluded that none of the Paragraph C criteria were satisfied. (R. 20). Based on these findings, the ALJ concluded that Brown's depression did not meet the listed requirements for a mental impairment.

Before moving to Step 4, the ALJ reviewed the medical record and Brown's hearing testimony to assess her RFC. The ALJ found that Brown's testimony about her symptoms was not credible and assigned weights to the medical source opinions, as described below. (R. 23-25). The ALJ then determined that Brown had the RFC to perform sedentary work, though numerous exertional and non-exertional restrictions were added to this finding. (R. 21). This RFC prevented Brown from performing her past relevant work at Step 4. At Step 5, the ALJ concluded that a substantial number of jobs were available that Brown could perform and that, as a result, she was not disabled. (R. 26-27). The ALJ's opinion became the Commissioner's final decision when the Appeals Council denied review on November 5, 2010.

### III. Discussion

Brown challenges the ALJ's decision on three grounds. She claims first that the ALJ erred by not assigning any weight to the opinion of nurse practitioner Katherin Lund and by improperly weighing Kr. Karayusuf's report. Brown also argues that the ALJ incorrectly assessed her credibility by failing to consider the guidelines of SSR 96-7p, which provides the framework within which an ALJ addresses a claimant's credibility.[3] Finally, Brown

---

[3] Social Security Rulings ("SSR") are published quarterly and are binding on all parts of the SSA. They do not have the force of law, but they "are to be relied upon as precedents in determining other cases where the facts are basically the same." *Lauer v. Bowen*, 818 F.2d 636, 640 n.9 (7th Cir. 1987).

argues that the ALJ incorrectly assessed her RFC. The Court addresses each of these arguments in turn.

## A. The ALJ Failed to Give Proper Consideration to Two Source Opinions

An ALJ is required to evaluate every medical opinion in the record. 20 C.F.R. § 404.1527(d). *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts . . . is exactly what the ALJ is required to do."). The regulations lay out six factors an ALJ should consider as part of this analysis, including the nature and length of the treatment relationship, the medical expert's specialization, and the degree to which a source's opinion is supported by other evidence. 20 C.F.R. § 404.1527(d)(1)-(6). The ALJ must clearly state the weight he has given to the medical sources and the reasons that support the decision. *See Ridinger v. Astrue*, 589 F. Supp.2d 995, 1006 (N.D. Ill. 2008).

### 1. Katherin Lund

On October 25, 2010, nurse practitioner Katherin Lund completed what is titled a "medical source statement" that assessed a broad range of Brown's functional abilities. Many of Lund's conclusions suggested more severe restrictions to Brown's ability to work than the other medical sources had found. Lund stated, for example, that Brown showed an "extreme" loss in her ability to concentrate and to carry out detailed instructions. She also determined that Brown had experienced "continual" episodes of decompensation, a Paragraph B factor under the special technique for assessing a mental impairment that no other health care provider believed Brown had met. (R. 268-72). *See* 20 C.F.R. § 1520a(c)(4) (describing decompensation under the special technique). The ALJ did not take note of Lund's report or assign it any weight in her decision. Brown argues that this

oversight is reversible error.  The Commissioner responds that the ALJ was not required to give Lund's report controlling weight because a nurse practitioner is not an acceptable medical source under the Rulings.

The Commissioner is correct that SSR 06-3p distinguishes between "acceptable medical sources" like licensed physicians and "other sources" such as nurse practitioners. SSR 06-3p.  However, the claim that remand is not required because Lund's opinion was not entitled to controlling weight is misplaced.  That is always the case with "other sources." *Id*.  An ALJ only considers such sources to assess the severity of an impairment, not to determine whether a medical impairment exists.  *See id.* (stating that only acceptable medical sources can be given controlling weight and establish the existence of an impairment).

Brown's point is that the ALJ was not entitled to overlook Lund's opinion altogether. The Court agrees with this position.  While only an acceptable medical source can be considered a "treating source" for establishing a diagnosis, SSR 06-3p is clear that the opinions of "other sources" like nurse practitioners "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id*.; *see also* 20 C.F.R. § 404.1513(d)(1). They must also be weighed using the same factors that apply to treating and acceptable sources.  SSR 06-3p. Social Security Ruling 06-3p stresses that an ALJ should "consider *all* of the available evidence in the individual's case record," including even non-medical sources such as teachers.  *Id*. (emphasis added).  An ALJ's failure to consider a nurse practitioner's opinion in accordance with these guidelines can amount to reversible error.  *Dogan v. Astrue*, 751 F. Supp.2d 1029, 1038-41 (N.D. Ind. 2010).

As discussed more fully below, proper consideration of Lund's report could affect a number of the ALJ's other findings in this case. The Court cannot say that the ALJ's oversight of Lund was merely harmless error on this issue because the opinion of a nurse practitioner like Lund can be given greater weight than an "acceptable medical source" under some facts. SSR 06-3p. Here, Lund appears to have had the longest-standing treatment relationship with Brown. The Commissioner correctly notes that there are inconsistencies between Lund's conclusions and other medical sources, but it is for the ALJ, not the Court, to resolve such conflicts. *Young*, 362 F.3d at 1001. The ALJ will be able to consider on remand what weight should be given to Lund's report by applying the appropriate criteria under SSR 06-3p. The ALJ was not entitled to disregard Lund's report out of hand.

### 2. Dr. Karayusuf

The ALJ assessed the "acceptable" medical sources in this case by giving "significant" weight to consulting psychologist Dr. Schuler, "substantial" weight to the non-examining state agency physician Dr. Kladder, but only "some" weight to examining psychiatrist Dr. Karayusuf. Dr. Karayusuf stood apart from the other acceptable medical sources by concluding that Brown could not interact effectively with co-workers or supervisors, and that she could not maintain pace and persistence in a job setting. (R. 25). Brown argues that the ALJ's decision concerning Dr. Karayusuf was erroneous because the ALJ failed to consider the consistencies between Lund's report and Dr. Karayusuf's. (Pl.'s Mot. at 8). The Commissioner does not address this issue.

The Court finds that the ALJ did not adequately explain the basis of her conclusion on the weight given to Dr. Karayusuf's report. An ALJ must always support her decision

with logical reasons that account for the evidence. *See Hodges v. Apfel*, 61 F. Supp.2d 789, 806 (N.D. Ill. 1999). The ALJ found that Dr. Karayusuf's opinion was entitled to "some" weight because the psychiatrist was only an examining physician, not a treating source with "special insight" into Brown's condition. (R. 25). Having used the fact that Dr. Karayusuf only examined Brown to de-emphasize his opinion, the ALJ then used the same fact to lend credibility to Dr. Schuler. She stated that Dr. Schuler's opinion deserved greater weight, at least in part, "because he was given the opportunity to examine the claimant." (*Id*.). An ALJ cannot claim that one medical source should be given greater weight because he examined a claimant while also finding that a second source should be given less weight for the same reason.

The ALJ also gave less weight to Dr. Karayusuf than to other medical sources because his opinion was deemed to be only "somewhat consistent" with the record. The basis for this conclusion is not clear as it concerns the key issue of whether Brown could work on a regular basis. Dr. Karayusuf found that Brown could not do so. The remaining evidence on this issue was the PRT of the non-examining physician Dr. Kladder, which the ALJ cited on this issue.

The problem is that ALJs are ordinarily required to give more weight to an examining physician like Dr. Karayusuf than to a non-examining one like Dr. Kladder. 20 C.F.R. § 404.1527(d)(1); *Criner v. Barnhart*, 208 F. Supp.2d 93, 954 (N.D. Ill. 2002). Although an ALJ is allowed to reach a different conclusion, she must explain the basis for her decision. Here, the ALJ did not discuss why Dr. Kladder's opinion on the work issue was more credible than Dr. Karayusuf's. *See Gudgel v. Barnhart*, 345 F.3d 467, 479 (7th Cir. 2003) (noting that a physician's opinion can be given different weights on different topics). The

Court notes that Dr. Schuler did not address Brown's persistence and pace and limited his finding to the conclusion that she "may" be able to perform some type of customer work. (R. 282). In light of the contradiction noted above, and the oversight of Lund's report, Plaintiff's motion is granted on the medical source claim.

### B. Substantial Evidence Does Not Support the Credibility Assessment

Brown next claims that the ALJ erred by finding that her testimony was not credible. According to her, the ALJ overlooked parts of her treatment history, discounted her testimony without an adequate explanation, and failed to properly consider her activities of daily living.

If an ALJ finds that a medical impairment exists that could be expected to produce a claimant's alleged condition, he must then assess how the individual's symptoms affect his ability to work. SSR 96-7p. The fact that a claimant's subjective complaints are not fully substantiated by the record is not a sufficient reason to find that he is not credible. Instead, the ALJ must consider the entire record and "build an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, any aggravating factors, the types of treatment received, any medications taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006); *see also* 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. A court reviews an ALJ's credibility decision with deference because "the ALJ is in the best position to determine the credibility of witnesses." *Craft*, 539 F.3d at 678.

The ALJ met part of this standard by discussing a number of the required credibility factors. For example, she reviewed much of the medical data concerning Brown's shoulder and neck disorders, the consultants' reports on her depression, and took some notice that Brown takes Vicodin to control her pain. Nevertheless, the Court agrees with Brown that the ALJ did not sufficiently follow SSR 96-7p's guidelines for assessing her credibility.

The ALJ's review of the record shows a significant oversight of Brown's treatment records. The ALJ claimed that no evidence supported Brown's testimony that she had sought chiropractic care for cervical spine pain. (R. 23). In reality, the record contains eighty-one pages of treatment notes by chiropractor Dr. Timothy Hammer for treatments extending from March 2009 through July 2010. (R. 538-619). The Court's earlier review of the record shows that these notes document Brown's ongoing struggle with pain. An ALJ is not permitted to overlook part of the treatment record and then use that oversight to undermine a claimant's credibility. *See Erhart v. Sec. of Health & Human Servs.*, 969 F.2d 534, 541 (7th Cir. 1992); *see also Brown v. Astrue*, No. 10 C 2153, 2012 WL 280713, at *19 (N.D. Ill. Jan. 30, 2012) (remanding so that an ALJ could consider overlooked medical records, including chiropractic treatments).

Along similar lines, the ALJ also failed to note the physical and occupational therapy Brown took in 2008 and 2010 to lessen her pain. (R. 299-306, 315-21, 495-526). Social Security Ruling 96-7p stresses that a claim of ongoing pain can be supported by a longitudinal record that shows how a claimant has sought to alleviate her symptoms. SSR 96-7p ("Persistent attempts by the individual to obtain relief of pain, such as . . . trials of a variety of treatment modalities . . . may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations

of intense and persistent symptoms.").  Brown pursued many avenues to relieve her pain, including recommendations that she undergo physical therapy.  The fact that Brown followed through with her doctors' advice was evidence the ALJ was required to consider when evaluating Brown's allegations.  *See Murphy v. Barnhart*, 417 F. Supp.2d 965, 972 (N.D. Ill. 2006) (criticizing an ALJ's failure to consider physical therapy records).

The ALJ bolstered her conclusion by noting that Brown pursued no individual therapy for her depression and attended only a few sessions of group therapy for diabetes patients with depression.  Although Brown's attorney questioned her on this topic at the hearing, the ALJ did not.  Ordinarily, an ALJ is not allowed to draw negative inferences about a claimant's reluctance to follow through with recommended treatments without first seeking an explanation for that fact.  *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012); SSR 96-7p.

The ALJ may have believed that the attorney's questions were enough to satisfy this requirement, but her reliance on the fact that Brown did not attend meetings for depression is troubling.  As noted above, Brown testified that she could not bear to talk of her children's deaths and began crying uncontrollably when she was asked about them.  The deference the Court owes to the credibility assessment is undermined by the ALJ's failure to take into account Brown's severe emotional reaction to her attorney's questions.  The Court finds it difficult to understand the basis of the ALJ's reasoning when the ALJ herself asked if she should call 911 at the hearing to help Brown.  At a minimum, the ALJ was obligated under these facts to explain in greater detail why Brown's reluctance to enter therapy made her allegations less credible.

The ALJ also concluded that Brown "pretended to be confused" in responding to questions in her SSA applications. (R. 24). No part of the record supports this finding, and an ALJ cannot rely "on an intangible or intuitive notion about an individual's credibility." SSR 96-7p. The record clearly shows that Brown suffered from ongoing memory and cognitive problems. This was the basis for the referral to Dr. Schuler, who found that her ability to learn and retain new information ranged between the borderline and low average level. (R. 281). The ALJ's oversight of Brown's documented confusion weighs against her credibility assessment.

The ALJ's discussion of Brown's pain and other symptoms raises additional concerns. The ALJ noted that Brown's neck pain was relieved by an injection, but she overlooked that Brown returned to the clinic only four days later and complained that these positive results had vanished. (R. 706). The ALJ also gave little consideration to the large amount of medication Brown took to control her pain and depression. Although she stated that Brown was taking Vicodin, the ALJ overlooked entirely the long history of her use of morphine, Soma, and a variety of antidepressants.

Instead of considering the extent of Brown's medication history, the ALJ relied on a pain-related drug incident to evaluate her credibility. In February 2010, Brown denied picking up a prescription for Vicodin that had been called into the pharmacy for her. A nurse at HCMC determined that the prescription had been retrieved and, as a result, that all further refills would first require an in-person consultation. (R. 732). The ALJ concluded from this incident that Brown had engaged in "drug seeking behavior." (R. 24).

However, the ALJ did not ask Brown about this event at the hearing or give her an opportunity to explain an incident that she vehemently denied when she was originally

confronted with it. Equally important, the ALJ failed to explain why the incident undercut Brown's allegation that she experiences serious pain. Brown continued to receive the same Vicodin prescription as before. The only change was that Brown was required to see her nurse practitioner before she was given refills. Before concluding that Brown was merely seeking drugs, the ALJ was required to account for the fact that her prescribing sources continued to recommend an array of potent pain medications to treat her symptoms.[4]

Finally, the ALJ's consideration of Brown's daily life does not support the credibility finding. Brown testified that she only buys food that can be microwaved, and that her children must help her with cooking and daily household chores. The children open cans for her, do their own ironing, and finish their homework without her help. (R. 45-46, 50). The ALJ also noted that she only goes grocery shopping once a month. The ALJ then concluded, without explanation, that Brown's pain allegations were not credible because she engages in "a large array of activities on a daily basis." (R. 23).

This Court simply cannot follow the basis for this reasoning. At best, the facts the ALJ noted constitute only occasional activities, not a large array of daily events. The ALJ overlooked that just because a claimant can engage in some activities each day does not automatically mean that her work-related or pain testimony is not credible. The Seventh Circuit has been clear that an ALJ must "consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day

---

[4] The Court notes that Brown discontinued the use of morphine by her own choice because it "made her too out of it." Brown later stated that she did not want any pain medication at all because "she has to learn to live with" her pain. (R. 531, 727).

five consecutive days of the week." *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004). *See also Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) (noting that washing dishes, cooking, and doing laundry are relatively minimal tasks that are "not of a sort that necessarily undermines or contradicts a claim of disabling pain"). Brown never claimed to be completely unable to do basic tasks or to be immobilized by her restrictions. She only stated that pain limits what she can do throughout the day on an ongoing basis. If the ALJ believed that Brown's daily activities undermined her credibility, she was required to account for factors like the support of others and the flexible schedule within which Brown functioned.

The Court recognizes that an ALJ is not necessarily required to discuss each of the seven factors involved in a credibility analysis. *Clay v. Apfel*, 64 F. Supp.2d 774, 781 (N.D. Ill. 1999). In this case however, the grounds the ALJ cited do not logically lead to the conclusion she reached, and significant parts of the record supporting Brown's credibility were overlooked. Plaintiff's motion is granted on the credibility issue.

### C. The RFC Issue

Before proceeding to Step 4 or Step 5, an ALJ must gauge a claimant's capacity to work by determining the individual's RFC. "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000. This means the maximum work the individual can undertake, not the minimum. SSR 96-8p. The RFC ordinarily includes exertional limitations such as the claimant's ability to walk, sit, push, or pull. It may also include a variety of non-exertional limitations like an individual's capacity to work with others, understand instructions, or work around hazards or heights. SSR 96-8p. In assessing RFC, an ALJ must consider the combined effect of

those severe and non-severe impairments that were identified at earlier stages of the five-step analysis, including any mental impairment found to exist at Step 2. *See* 20 C.F.R. § 416.923. The ALJ can only properly reach a conclusion on this issue by considering all the relevant evidence in the record, including the medical history, medical source statements, and reports of a claimant's activities of daily living. SSR 96-8p.

Brown argues that the ALJ did not meet this standard because she failed to account for the mental limitations identified as part of the special technique applied at Step 3, particularly Brown's erratic sleep patterns. The Commissioner responds that the ALJ was not required to include all the Step 3 mental limitations in the RFC because the special technique's findings are not equivalent to RFC restrictions. The Court agrees that an ALJ cannot rely on the special technique to assess RFC and must provide a "more detailed assessment" of a claimant's functioning at the RFC stage. SSR 96-8p. In this case, the ALJ followed this directive for some of the limitations identified by the special technique. The RFC included, for example, several non-exertional restrictions that provided for breaks and repetitive job activities.

That said, the ALJ did not explain how Brown's Step 3 limitations in daily living, especially her sleep disturbance, were considered in the RFC. The ALJ specifically stated that Brown's sleep problems were "consistent" with the limitations identified in the special technique.[5] (R. 20). The fact that the special technique did not establish Brown's mental

---

[5] The Commissioner rightly notes that the ALJ's Step 3 assessment is not a credibility finding. However, the ALJ failed to provide any explanation of why Brown's allegation was "consistent" with her limitations at Step 3 but was, for all accounts, dismissed in the credibility assessment. If Brown's sleep claims were not believable, it is difficult to understand why the ALJ found at Step 3 that they were consistent with the moderate limitations in daily activities that the ALJ found were present.

RFC does not mean that the ALJ was entitled to identify a condition at one step that could seriously restrict Brown's capacity to work and then fail to provide any indication of how that limitation was accounted for in the RFC.

An ALJ must consider all identified limitations and cannot merely incorporate her earlier findings into the RFC without explaining how she reached her conclusion. *See Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012); *Kasarsky v. Barnhart*, 335 F.3d 539, 544 (7th Cir. 2003). This includes the results of an ALJ's special technique analysis. *See also Muzzarelli v. Astrue*, No. 10 C 7570, 2011 WL 5874793, at *23-24 (N.D. Ill. Nov. 18, 2011). Here, the ALJ never mentioned Brown's sleepiness. It may be that the ALJ believed that Brown's sleep disturbance was not sufficiently severe to be part of the RFC. Or she may have believed that the current RFC accounted for all the limitations she identified at Step 3, including sleepiness. But without any explanation, the Court cannot follow the ALJ's reasoning on this issue.

The problem is exacerbated by the fact that the ALJ also failed to explain why Brown would be able to work a full schedule in light of her RFC. Social Security Ruling 96-8p obligates an ALJ to "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)." SSR 96-8p. The ALJ did cite Dr. Kladder's finding that Brown could work on a continuing basis, but that not only fails to provide the "narrative discussion" SSR 96-8p requires, it does not account for the sleep disturbances that the ALJ herself found to be consistent with the special technique's results. The ALJ's flawed credibility analysis, combined with her assessment of Dr. Karayusuf and oversight of nurse Lund, require the ALJ to explain in more detail why Brown has the ability to work

a full schedule.

Brown limits her arguments to the mental RFC, and the Court only remands on that ground. The Court notes, however, that the ALJ's physical RFC is also problematic and, given that remand is in order, should be revisited by the ALJ. The ALJ found that Brown could perform a reduced range of sedentary work. (R. 21). Sedentary work involves lifting no more than ten pounds at a time. 20 C.F.R. § 404.1567(a). The problem with this finding is that it conflicts with the only physical RFC in the record, which was given by state agency physician Dr. Richards. He determined that Brown could perform medium work. The ALJ stated that she gave Dr. Richard's opinion only "some" weight because he concluded that Brown was "able to do even more than her current [RFC]." (R. 24). This can only mean that she rejected Dr. Richard's opinion because it conflicted with ALJ's own RFC conclusions.

An ALJ is allowed to reject a medical source if other evidence contradicts it. But having set aside the only physical RFC in the record, the ALJ was left with an evidentiary gap concerning Brown's proper exertional level. "What the ALJ could not do was fill in the gap on her own." *Daniels v. Astrue*, 854 F. Supp.2d 513, 523 (N.D. Ill. 2012). Even when the record contains evidence on an individual's ability to work, "[t]he ALJs are not permitted to construct a middle ground RFC without a proper medical basis." *Norris v. Astrue*, 776 F. Supp.2d 616, 637 (N.D. Ill. 2011) (internal quote and citation omitted). *See also Newell v. Astrue*, No. 11 C 1907, --- F. Supp.2d ---, 2012 WL 1405731, at *15 (N.D. Ill. April 23, 2012). The ALJ did not cite any basis for her physical RFC findings. Plaintiff's motion is granted on the RFC issue.

## IV.  Conclusion

For the reasons stated above, Plaintiff's motion for summary judgment is granted and Defendant's Motion To Affirm The Commissioner's Decision [22] is deneied.  This case is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  It is so ordered.

**ENTERED:**

_____
**DANIEL G. MARTIN**
**United States Magistrate Judge**

Dated: December 19, 2012